Earllen ROWE, Plaintiff

v.

**MASS TRANSIT ADMINISTRATION,**
Phyllis J. Love, George Deaver, and
Leonard Thompson, Defendants

No. CIV. AMD 02–216.

United States District Court,
D. Maryland.

July 28, 2003.

Michael J. Snider, Snider and Fischer LLC, Baltimore, MD, for Plaintiff.

Jessie Lyons Crawford, Callista Marie Freedman, J. Joseph Curran, Jr., Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

DAVIS, District Judge.

Plaintiff, Earllen Rowe, a former employee of the Mass Transit Administration ("MTA"), an agency of the State of Maryland, filed this employment discrimination case in state court after her employment was terminated for misconduct. The defendants, who include three supervisory individuals who are sued solely in their official capacities, timely removed the case to this court. The claims asserted include the following: (1) denial of reasonable accommodation, disparate treatment, hostile environment, and retaliation claims pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12117 ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794; and (2) race and gender disparate treatment claims, harassment claims, and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); and (3) redundant statutory and constitutional claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1986. Discovery has been completed and defendants have filed a motion for summary judgment. The issues have been fully briefed and a hearing has been held.

For the reasons stated herein, I shall grant defendants' motion.

## I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

## II.

Of course, the material facts shall be set forth in the light most favorable to plaintiff's version of events. Nevertheless, I am constrained to observe that plaintiff has taken broad liberties and claimed a robust literary license with the summary judgment record in numerous regards, e.g., by asserting as "facts" what are no more than argumentative contentions that rest on unreasonable and speculative presumptions as to the effect of historical occurrences, and by attempting to contort the summary judgment record to support wholly unreasonable inferences. For instance, as set forth below, the record makes clear (and plaintiff essentially conceded at her deposition) that *all of plaintiff's claims arise out of events which occurred during a two week period of November 1999.* Disregarding this reality (and her own Charge of Discrimination filed with the Equal Employment Opportunity Commission), plaintiff has attempted to rely on events and interactions with defendant Love months before November 1999 (as well as events which occurred in the workplace while plaintiff was at home on leave after November 1999). I reject this attempt and regard the material facts of the case to be those arising in November 1999 as the record demonstrates. In a similar vein, plaintiff has made a transparent attempt to meld potential claims and remedies which she might have enjoyed under

her union's collective bargaining agreement with statutory non-discrimination claims, e.g., she repeatedly describes the "light duty" assignment she was given as "illegal" because an arbitrator ultimately concluded that the subject of light duty assignments was properly a topic for negotiation under the applicable collective bargaining agreement. But this circumstance is irrelevant to the issues presented in this discrimination case, and plaintiff's desperate attempt to inject labor law/collective bargaining issues into this case is rejected as unavailing. Accordingly, the statement of facts set forth herein reflects these threshold determinations.

Rowe is a 52–year–old African–American. She was hired on December 30, 1996, as a part-time bus operator and assigned to the Northwest Bus Division of the MTA. Shortly thereafter, she became a full-time bus operator and was soon reassigned to the MTA's Bush Street Division on February 1, 1998. Defendant Phyllis Love ("Love"), a white female, was the Chief of Bus Operations and Rowe's second level supervisor during the events giving rise to this case. Defendant George Deaver ("Deaver"), who is African–American, was an Assistant Superintendent and Rowe's first level supervisor. It was Deaver's decision to terminate Rowe's employment, but in any event both Love and Deaver were the principal decision-makers in respect to the adverse employment action taken against Rowe. Defendant Leonard Thompson ("Thompson") was the Supervisor of Mobility; he was not in Rowe's supervisory chain of command and he had no material role in any adverse employment action taken against Rowe. Assistant Superintendent James Seiling ("Seiling") was involved in certain material facts but has not been joined as a defendant.

On the evening of October 31, 1998, Halloween, Rowe was assaulted by several boys who threw eggs at her as she sat on her bus at a rest stop along her assigned route. In attempting to protect herself from further assault, Rowe apparently ran from the front of the bus toward the rear of the bus and in doing so she slipped on the broken eggs and fell. She injured her left arm and shoulder. (Rowe also suffered from certain non-physical psychological symptoms from the stress of the Halloween incident, although, beyond a short written evaluation prepared in November 1998, the record contains no information concerning the psychological impact of the Halloween assault on Rowe.)

As a result of the Halloween attack, Rowe filed a worker's compensation claim for the injuries to her shoulder. From the date of her injuries through the Fall of 1999, Rowe was regularly seen and treated by Douglas M. Shepard, M.D., her orthopaedist, who regularly certified her as disabled from her work responsibilities at the MTA. Eventually, Dr. Shepard concluded that Rowe had achieved maximum medical improvement without surgery and he recommended that she undergo arthroscopic surgery to repair a partially torn rotator cuff in her left shoulder. Dr. Shepard anticipated that Rowe would require at least a three month course of rehabilitation following her surgery before she could resume her bus driving duties. Rowe underwent surgery on October 13, 1999. The sutures were removed from her shoulder on October 26, 1999. Dr. Shepard instructed her to "wear a shoulder sling while out of the house to prevent inadvertent recurrent trauma." Rowe remained disabled from driving a bus and she remained on leave receiving worker's compensation benefits.

Meanwhile, prior to November 1999, the MTA had retained a consultant to design a

program enabling an employee on disability leave, including worker's compensation leave, to return to work in a light duty capacity, provided the treating physician determined such an employee was able to do so. Thus, the consultant devised a so-called "Bridge Program," by creating a series of light duty jobs called "bridge assignments." Under the program, a list of "light duty" positions would be sent to an employee's treating physician, who, after assessing the requirements of her patient's proposed placement and considering any necessary restrictions on her patient's ability to perform the assigned tasks, including time limits and other restrictions, would complete a form releasing the patient/employee to work on the approved assignment. The program was initially implemented in November 1999 as a pilot project by MTA's Risk Management Office at the Bush Street Division in anticipation of system wide implementation.

Thus, on November 2, 1999, one week after Rowe's sutures had been removed, Love sent Dr. Shepard a packet of information introducing the program and requested that he determine whether Rowe was able to accept any of a variety of light duty assignments. In particular, Love apparently proposed to Dr. Shepard that Rowe be assigned duty as an "ADA Transit Ambassador." The essential functions of this position were described as follows:

> Worker may perform any combination of the following or similar tasks as directed: rides buses to aide operators in calling out stops, points of interest, light rail stations, university stops, hospitals and major intersections to assist in compliance with ADA mandates. May transfer to different buses/lines throughout shift. May remind disabled passenger to exit transit vehicle at desired stop. Will record all ADA announcements.

The form to be used in implementing the light duty assignment contained spaces for the physician to approve the assignment "as is" or "with modifications" or for the physician to indicate that the proposed assignment was "disapproved for the following medical reasons."

Remarkably, although Dr. Shepard apparently had a previously-scheduled appointment to examine Rowe on November 9, 1999, and although he did indeed examine her that day in his office, he did not mention to, or discuss with, Rowe, the MTA's request that he release Rowe for a light duty assignment. In any event, after Dr. Shepard examined Rowe on November 9, 1999, he completed the light duty form and released Rowe to return to work in order to perform the ADA Transit Ambassador light duty assignment. Specifically, Dr. Shepard stated the following on the form: "(1) Work four hours a day; (2) No use of left arm and hand; (3) Patient will be re-evaluated at next appointment on November 30, 1999." Dr. Shepard's office faxed the form to MTA on the same day, November 9, 1999.

For reasons not explained in the record, Love visited Rowe's home on the morning of November 10, 1999, to speak to Rowe about returning to work on that very day pursuant to the release signed by Dr. Shepard. The record shows that Rowe normally worked an afternoon-to-evening shift. Rowe was slow getting to the door, and Love knocked insistently for an extended period of time, drawing the attention of Rowe's neighbor. Rowe was delayed in getting to the door because she was "lightly dressed" in her second floor bedroom so as to facilitate her access to the bathroom, and because she did not expect any visitors. Although Rowe's husband testified that Rowe *never* answers the door when he is not at home (even if it were the President of the United States

knocking) as a "safety factor," Rowe admits that she did descend the stairs to answer the door. Love had departed by the time she got there. Love left a letter taped to the door advising Rowe of her release by Dr. Shepard and directing her to report to work that day. Specifically, Rowe was to report for duty at 4:45 p.m. for a four-hour shift on her regularly assigned bus route to act as ADA Transit Ambassador. The letter advised Rowe of the following: (1) "Refusal of this position or failure to report as ordered will possibly result in suspension of your time loss benefits and/or termination of your employment with us;" and (2) "[i]f you have any questions or you are unable to report as directed you are to contact" either Love or Seiling at an indicated telephone number.

The record leaves no room to doubt that Rowe was outraged by this development. Rowe firmly believed, contrary to Dr. Shepard's view, which she had never discussed with him as of November 10, 1999, that she remained fully disabled from any work at MTA, light duty or not. Specifically, Rowe asserts that, as of November 10, 1999:

> I remained unable to perform a variety of activities . . . . I could not sit upright . . . for more than a few minutes . . . . I was unable to use my left arm and wrist for any major life activity, such as disrobing to use the restroom facilities. Physically moving my arm gave me great pain.

Rowe called Dr. Shepard; she also called her husband and together they complained to her union president, Ennis Fonder ("Fonder"). Fonder, Rowe and her husband called the then Administrator of the MTA, an African–American male, to complain that Rowe should not be "forced back to work." Up until this time (November 10, 1999), neither Rowe nor anyone on her behalf had complained about any race-or-gender-based or disability-based discrimination or maltreatment, and Rowe did not raise the issue of race when the MTA administrator was contacted on November 10, 1999. That is to say, on deposition, Rowe testified with unmistakable clarity that her complaint to the MTA Administrator on November 10, 1999, was strictly limited to the issue of whether she should be required to take a light duty assignment before she felt she was physically able to do so. In essence, she testified that Love was "retaliating" against her (by requiring her to take a light duty assignment before Rowe felt ready to do so) because Rowe had received worker's compensation benefits and had been off on leave (for more than a year).

In the meantime, sometime on November 10, 1999, Love received a call from Lea Brown ("Brown"), an assistant in Dr. Shepard's office. Brown told Love that she had received a disturbing telephone call from Rowe who was irate because Dr. Shepard had released Rowe to work on light duty. According to Love's account of her conversation with Brown, Brown warned Love not to place Rowe on a bus to perform a light duty assignment because Rowe had stated to Brown that she "would re-injure herself if she had to ride a bus as a[n] ADA Ambassador." Love attests that she advised Brown that she would change Rowe's assignment so that Rowe would not be required to perform the light duty assignment on a bus.

As might be imagined, plaintiff has gone to great lengths to refute Love's account of her extraordinary November 10, 1999, conversation with Brown. During the pendency of the Union grievance proceedings after Rowe had been terminated but before this case was instituted, Rowe contacted Brown at her new place of employment, apparently without the knowledge of Rowe's attorney. Brown agreed to give

Rowe an unsworn "letter" dated August 24, 2000, addressed "To Whom It May Concern." The letter reads as follows:

This letter is to acknowledge that there was never a statement made to Phyllis Love in regards to Earllen Rowe on the date of November 10, 1999. There was never a confrontation discussion between Earllen and myself on the day of November 10, 1999. If there is any further information needed in regards to this situation, please feel free to give me a call . . . .

After Rowe obtained Brown's signature on the letter, Rowe purported to obtain a "notary" on the letter by simply having a notary public in some unidentified state sign the document. Manifestly, the letter is not a proper statement under the penalty of perjury and is disregarded for purposes of the pending motion for summary judgment.

Recognizing the devastating impact of Love's account of her November 10, 1999, conversation with Brown, at the hearing on the motion for summary judgment, Rowe attempted to generate a genuine dispute of material fact as to the fact of and the content of the alleged November 10, 1999, Love–Brown conversation by relying on Brown's deposition testimony. In fact, Brown's deposition testimony does absolutely nothing to undermine the truthfulness of Love's account; it actually bolsters Love's account. First, contrary to Rowe's assertion that Brown told Rowe that, "I've never even spoken with Ms. Love," *see* Deposition of Earllen Rowe, June 4, 2002, at 72 (Plf.'s Exh. 11), Brown testified as follows in respect to her conversations with Love:

Brown: [M]ost of our conversations were via the phone. . . .

Q: Okay. How many time[s] did you speak with her by phone?

A: ·I couldn't tell you. I don't know.

Q: More than two?

A: Oh, sure.

Q: Do you recall, in general, the contents of the conversations . . . ?

A: It would generally be about a patient and if they were going to get any assignments or what they wanted to try to offer the patient to try to put them back to work and then try to get the information from the doctor and send it back to her.

Q: Did you deal with Ms. Love in relation to more than one patient?

A: Probably. I don't recall exactly, but probably.

Q: Do you recall most of your conversations dealt with trying to get injured patients back to work?

A: For the most part, yeah.

Q: Do you recall Ms. Love— have you ever called Ms. Love on the phone?

A: Probably. I would have had to return phone calls to her about patients.

Q: Have you ever initiated your own phone call to her, not in response to one of her calls?

A: I couldn't answer, I don't know.

Q: Does that sound like something that you would have done?

A: If I had to speak to her about a patient, I would have called her.

*See* Deposition of Lea Brown at 8–10 (Defs.' Exh. 12).

Second, plaintiff's attempt at the deposition to get Brown to deny the essence of Love's account of their conversation, that Rowe had threatened to injure herself, was an absolute failure. Brown repeatedly protested that she *could not recall* saying such a thing, that she *did not know* if it was "the type of thing [she] would have said," and that she could *"not recall"* the *conversation. Id.* at 13. Indeed, when asked bluntly, "[I]f Ms. Love said under

oath that she's positive the conversation happened, what would your response be?," Brown responded, "I don't have an answer. I'm not going to answer it." *Id.* at 13–14. Finally, when confronted with the August 18, 2000, letter described above and asked whether "that" is "a true statement," Brown testified "*I don't recall.*" *Id.* at 14. Indeed, Brown explained that the gravamen of the August 18, 2000, letter was that she did not have an *argument* or a *confrontation* with Rowe on November 10, 1999. *Id.* at 17, 29, 40–42. Based on the record before this court, although I accept (as I must) Rowe's assertion that she did not threaten to injure herself if she were required to take a light duty assignment against her will, the affirmation by Love of the statements attributed to Brown are unrebutted in this record.

Rowe reported to work for her "bridge assignment" on November 10, 1999 as directed. Fonder prevailed upon Love that Rowe should not perform her light duty assignment on a bus, and Love had determined independently (as described above) that Rowe would not be assigned to perform her light duty on a bus. Thus, Rowe was assigned the following task: to sit inside the Bush Street facility at the egress to the bus pick-up lot to remind drivers to comply with their responsibilities under the ADA and to check the badges of drivers as they departed for their runs. In performing her duties, Rowe was required to sit near a doorway, which Rowe believed posed a risk to her of "jostling." Rowe weighs more than 230 pounds and she insisted almost immediately that the chair and desk combination where she was required to perform these rudimentary tasks were too small for her girth, but neither Deaver (her first tier supervisory) nor Love would respond sympathetically to her requests for a larger chair. She affirms that she suffered severe pain in her shoulder and arm as a result of the tiny desk and the uncomfortable wooden chair at which she was stationed.

The next day, Thursday, November 11, 1999, Rowe met with Dr. Shepard to discuss her continuing pain, the light duty assignment, and how the assignment might affect her recovery. Rowe asserts that Dr. Shepard advised her that he did not want her on the bus because the jostling of passengers on a bus and the unpredictable movements of a bus could aggravate her injury and hinder her recovery. In a disability certificate he signed that same day, Dr. Shepard certified that Rowe was totally incapacitated from November 11, 1999, through November 30, 1999, and that he would reevaluate her on November, 30, 1999. That day, Rowe's husband delivered the certificate to the Assistant Superintendent at the Bush Street Division, Seiling.

Seiling was aware of the light-duty experiment and he had spoken with Love about Rowe's threat as communicated by Brown. He was puzzled by this new certification from Dr. Shepard so he called the doctor. Dr. Shepard promptly revised his assessment and told Seiling that Rowe could indeed return to a light duty assignment (on Monday, November 15, 1999) so long as she worked no more than two hours a day and so long as she did not work on a bus, an issue which had already been resolved. Later that day (Thursday, November 11, 1999), Rowe and her husband met with Seiling; they told him that Rowe could not get to work (at around 2:00 p.m.) because she could not drive and her husband was not available in mid-afternoon to transport her. Seiling offered to arrange for an MTA mobility van to pick up Rowe at home, with the proviso that Rowe's husband would pick her up and take her to her scheduled therapy and then home in the evening. This arrangement was acceptable to the Rowes.

On Monday, November 15, 1999, Rowe reported to work as scheduled. She had difficulty dressing and undressing as a result of her injury. Rowe asserts that she was assisted into her uniform by her husband in the early morning before he left to go to work, even though she was not to be picked up by the mobility van until approximately 2:00 p.m.

Rowe strongly condemns the circumstances under which she was required to perform her light duty assignment on November 15. Again, she complains that the desk and hard wooden chair provided were too small for her, and was situated just outside the doorway, so that someone sitting there was susceptible to jostling on her left side. Rowe claims she begged Deaver to provide her with a larger chair or something (a pillow) upon which to rest her arm. Further, Rowe asserts that when she stood up, she was "ordered into her seat" by Love—"not with words, but with a degrading glance and pointing of the finger."

On Tuesday, November 16, 1999, a mobility van driven by Reginald Sullivan ("Sullivan") was assigned to pick up Rowe from her residence at 2:00 p.m.; Sullivan arrived late, at 2:33 p.m. Rowe was carrying her purse and a water bottle. Her left arm was in a sling, per Dr. Shepard's instructions. She boarded the bus and sat down without incident. Rowe states that although she was clearly and obviously unable to do it herself, the driver offered no assistance to help Rowe put on her seat belt. (Rowe asserts that 49 C.F.R. 37.165 required Sullivan to assist Rowe in buckling her seatbelt. That regulation, primarily discussing common wheelchairs and their users, states that "[w]here necessary or upon request, [a public or private entity's transportation vehicle] personnel shall assist individuals with disabilities with the use of securement systems, ramps and lifts. If it is necessary for the personnel to leave their seats to provide this assistance, they shall do so." 49 C.F.R. 37.165 (2003).)

The van proceeded down a slight decline on Courtney Boulevard towards Wilkins Avenue. There is a stop sign at Wilkins Avenue. Sullivan attests that he was traveling from 25 to 30 miles per hour and began a smooth braking process. Before the bus came to a stop, Sullivan testified, he heard Rowe scream. Rowe then fell off the seat and onto the floor of the van; when the van came to a stop, Sullivan observed that Rowe was on her stomach at the fare box.

Sullivan contacted the Bush Street Division of the incident at approximately 2:40 p.m. Sandra G. Bell ("Bell"), a safety officer for the MTA, was the first to arrive on the scene. Bell stated she found Rowe positioned on the floor with her head lying near the front door. She also stated that her body was lying in a straight angle positioned with her feet toward the left side passenger seats, about three feet from where she had been sitting. Bell assisted Rowe by trying to comfort her and she telephoned Rowe's husband. Understandably, Bell proceeded to inquire about the incident. Bell noticed that although Rowe was on the floor of the mobility van some three feet from where she had been seated, Rowe's water bottle and her purse remained on the seat. According to Bell, Rowe stated that she fell out of the passenger seat, but she then declined to continue the interview, explaining that she was in pain. Rowe did not allege that Sullivan had come to an abrupt stop. Bell and Sullivan attests that Rowe could plainly overhear Bell as she questioned Sullivan as to what had happened and Rowe said nothing to dispute anything Sullivan stated. Rowe contends that her pain was a

distraction and that she paid no attention as Bell questioned Sullivan.

Bell took several photographs of the scene; they are in the record. Almost immediately upon her assessment of the scene after her arrival, Bell (as well as others who appeared at the scene, including the individual defendants) was befuddled as to how the incident occurred, namely, as to how Rowe (who weighed over 230 pounds) could have been thrown more than three feet from where she had been seated while the water bottle and purse remained in place on the seat. Love observed that:

> [a] mobility vehicle has soft seats that, when sat on, places the balance of an individual's weight in the rear of the seat. A person's bottom would sink into the seat forcing the person into the seat. The seat faces the aisle, and immediately to the right of the seat is a barrier. If someone were to make a sudden stop the barrier would prohibit [sic] the person from being tossed toward the front of the vehicle where the operator [sic] sits.

After Rowe left by ambulance for the hospital, Love, Bell, Thompson, and Sullivan decided to conduct a re-enactment of the incident to figure out what was necessary to be done to prevent future accidents. Bell stated that two re-enactments were conducted immediately afterwards, one at 25 miles per hour and a second at 30 miles per hour with a normal and abnormal stop on Courtney Road. Bell concluded that both tests were negative; she was unable to create the same situation. Thereafter, the mobility van was taken to the shop for a test of the brakes; mechanics found no defects.

On November 17, 1999, at approximately 3:15 p.m., four additional attempted re-enactments were staged using the same mobility van. The tests consisted of various speeds and different seated positions in an effort to create the same situation that Rowe alleged occurred. The tests were performed with Bell and Deaver seated in the right passenger seat with their left arm inoperable. During the four re-enactments, one similar occurrence could be replicated: when the vehicle was moving at 35 miles per hour, and the passenger in the seat occupied by Rowe was at the very edge of the seat with their legs folded completely backward, and the vehicle came to an "absurd stop," it was found that the risk of an accident was significant. When a passenger is properly seated with the back flush against the seat back cushion, even without restraints and with an abrupt stop, the side panel should prevent the passenger from falling out of the seat.

Rowe contends that the re-enactments are unreliable and she disputes certain statements attributed to her by Bell, e.g., that she admitted that had been sitting upright with her back against the cushion of the seat. In her affidavit, Rowe attests that she had been seated somewhat hunched over to keep some distance between her shoulder and back and the back of the bench seat to protect her injured arm. Rowe also asserts that she had been conversing with Sullivan when she fell out of her seat and that she was unable to grab something to break her fall.

MTA has designated an expert in accident reconstruction, R. Scott Wills, to analyze the data generated by its investigation of the November 16, 1999, incident. The Willis report states that, "Ms. Rowe would have to be seated with the majority of her body leaning forward of the leading edge of the seat and forward of the vertical pole and barrier." Wills was informed that Rowe stated that prior to the incident, she was seated in her seat with her back against the backrest of the seat; if so, the force that Rowe described would have

caused her to move along the lateral line of the vehicle, instead of along the longitudinal line where she landed. Further, Wills indicated that "[t]he fact that the extremely unstable bottle remained on the seat would tend to support the testimony of the vehicle operator that the stopping action was gradual and not sudden and forceful as claimed by Ms. Rowe."

In the final analysis, the MTA concluded that serious questions were raised about Rowe's account of the incident because, in addition to the re-enactments and Rowe's threat to injure herself: (1) the incident occurred on a clear day; (2) the driver (a 25 year employee) was approaching a stop sign that was clearly visible from at least a half mile away; (3) he denied making a sudden stop; (4) there had never been an accident reported of a passenger claiming to have fallen out of a mobility van seat. A final determination as to whether disciplinary action should be taken against Rowe was delayed because, as a result of the November 16, 1999, incident, Dr. Shepard removed Rowe from the light duty program until February 15, 2000.

On February 22, 2000, after Rowe had returned to work on light duty, Deaver determined to finalize the MTA investigation of the November 16, 1999, incident. He had Rowe take a seat on the mobility van, allegedly instructing her to sit on the van as she had been seated on the day of the incident. Rowe denies that she was so instructed; she asserts that Deaver simply ordered her to "[g]o out there and sit on the bus." According to Rowe, Deaver would not tell Rowe the reason for the order. Rowe sat in the mobility van and, with Rowe's consent, Deaver photographed Rowe while she was seated. Immediately thereafter, Deaver presented Rowe with a disciplinary report (an "MW–006"), charging Rowe with several violations of the code of conduct relating to the duty of

truthfulness for employees covered by the relevant collective bargaining agreement. Deaver informed Rowe that he was recommending that she be dismissed.

Pursuant to the collective bargaining agreement, a base-level hearing was held on August 18, 2000, after the hearing had been delayed by Rowe's failure to cooperate with the Union in scheduling the hearing. Love conducted he base-level hearing and determined that the MTA had just cause to dismiss Rowe for the reasons stated in the MW–006. She found that "by creating an accident situation Ms. Rowe was not being loyal to the interests of the MTA; by filing a false accident report and injury report to support her version of the incident she was dishonest and knowingly made untruthful statements."

Thereafter, the Union made a timely request for an appeal hearing, in accordance with the collective bargaining agreement. In a letter dated April 12, 2001, addressed to Fonder, Aaron E. Smith, Jr., the MTA's Manager of Bus Operations, noted that the appeal hearing was set for April 17, 2001 at 1:00 p.m. The Union (and Rowe) failed to appear; the hearing proceeded without them. The next day, April 18, 2001, Fonder faxed a letter to Smith in response to the letter dated April 12, stating that the Union had received the notice of the April 17 hearing as set forth in the April 12 letter on the afternoon of April 16, 2001, but that the Union had other matters to attend to on April 17. Ignoring (or ignorant of) the fact that the hearing had proceeded on April 17 despite the Union's absence, the Union suggested that a hearing could be scheduled on any date after April 18. Smith responded in a letter dated April 18, 2001, stating that he had conducted the appeal hearing as scheduled and that, after reviewing the available documentation surrounding the case, and not

having any rebuttal from the Union, he had sustained Rowe's dismissal.

Thereafter, in accordance with the collective bargaining agreement, the Union submitted the matter to arbitration. The arbitration was scheduled for January 6, 2003, after this case had been filed. However, the Union withdrew its demand for arbitration; the record does not disclose whether the withdrawal of the demand for arbitration was with or without Rowe's consent or acquiescence.

On December 1, 2000, Rowe filed a Charge of Discrimination with the Equal Employment Opportunity Commission. Rowe stated therein that she was subjected to harassment, hostile work environment and denied reasonable accommodation because of her race, sex, and disability starting in November 1999. Rowe also stated that on or around November 10, 1999, she was "subjected to retaliation for reporting unfair employment practices." Rowe timely filed suit in the Circuit Court for Baltimore City on December 20, 2001. Defendants removed the case to this court on January 22, 2002.

### III.

I shall first analyze Rowe's disparate treatment and retaliation claims under Title VII and the ADA. It appears that Rowe attributes racial animus solely to Love, the only non-African-American named individually as defendant (all of whom are joined, however, and curiously, only in their official capacity). It also appears that, at least in part, Rowe contends that those claims are supported by both direct evidence and circumstantial evidence sufficient to support a verdict in her favor, without regard to the shifting burdens proof scheme of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). So far as I can tell, the admissible evidence encompassed by

this assertion apparently is limited to evidence of certain statements attributed to Love during early 1999. Allegedly, in the course of a meeting concerning medical certifications or during some other interaction with Rowe and perhaps one other African–American female employee who was also on sick leave and/or worker's compensation leave, Love used the terms "you people" and "worker's comp queen" in announcing and/or describing her belief that, as characterized by Rowe, African–American females intentionally or recklessly take poor care of themselves and, concomitantly, act purposefully to lengthen periods of disability so as to avoid returning to work. Also, Rowe seems to make much of what she characterizes as Love's general discourteous and intimidating manner toward African–American female employees, relying on an affidavit characterizing certain interactions between Love and African–American females other than Rowe after the light duty program was instituted in November 1999 and while Rowe was on leave.

I reject Rowe's contention that the record contains substantial direct or circumstantial evidence of racial animus or retaliatory animus. First, Rowe candidly admits that until she was ordered to report for a light duty assignment on November 10, 1999, she had no basis for any complaint of discrimination or mistreatment whatsoever. She is bound by that admission. Nor is there a scintilla of evidence in the record of any adverse employment action by the MTA other than Rowe's termination, an action taken by Deaver, not Love (although Love was the decision-maker at the base-level hearing). It appears, furthermore, that Rowe attempts to argue that the very requirement that she accept a light duty assignment is itself an "adverse employment action," but I also reject this contention

as fantastic and unsupported by any case law. Finally, it must be noted that Rowe has specifically not chosen to assert a retaliation claim under the Maryland Worker's Compensation law. *See Ewing v. Koppers*, 312 Md. 45, 537 A.2d 1173 (1988) (recognizing a wrongful discharge claim predicated on the theory that the employee was discharged in retaliation for filing a worker's compensation claim); *Kern v. South Baltimore Gen. Hosp.*, 66 Md.App. 441, 452, 504 A.2d 1154 (1986)(discussing elements of a statutory claim for wrongful discharge under the Worker's Compensation Act).

Thus, Rowe's disparate treatment and retaliation claims are properly analyzed under the shifting burdens proof scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff bears the burden to initially establish a prima facie case of discrimination or retaliation. *Id.; Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to make out a prima facie case of discriminatory discharge from employment, plaintiff must show: "(1) that [she] is a member of the class protected by [the non-discrimination statute], (2) that the prohibited conduct in which [she] engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against [her] were more severe than those enforced against those other employees." *Carter v. Ball*, 33 F.3d 450, 461 (4th Cir. 1994).

Once a prima facie case is established, then the case proceeds in the long familiar manner as I described in *Nichols v. Harford County Bd. of Educ.*, 189 F.Supp.2d 325 (D.Md.2002):

> [o]nce the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production is placed on the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because the employer's burden is one of production and not of persuasion, it "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (internal quotation marks omitted) (*quoting E.E.O.C. v. Western Electric Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's race or sex. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742.

*Nichols*, 189 F.Supp.2d at 340–41.

The Supreme Court clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff, because "it is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (*quoting Hicks*, 509 U.S. at 519, 113 S.Ct. 2742). However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined

with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.*

█ It is clear that Rowe has not established a prima facie case of discriminatory discharge based on employee misconduct. Indeed, Rowe has not even attempted to *identify* a similarly situated employee who was not an African–American or not a female or who was not disabled, as to whom an investigation revealed substantial reason to believe the employee had falsified an accident report involving an alleged injury to that employee. Thus, I need not consider whether Rowe has marshaled substantial evidence of pretext.

█ Even if it were assumed, however, that Rowe had made out a prima facie case of disparate treatment on the basis of race, gender or disability, Rowe has not cast doubt on the bona fides of the MTA's asserted non-discriminatory reason for her termination. The record shows that the MTA has never wavered from its singular explanation for Rowe's termination: a thorough investigation of the circumstances surrounding Rowe's involvement in the November 16, 1999, incident persuaded Deaver, and the reviewing officials as well, that Rowe had falsified her account of the incident in violation of her clear and unambiguous duty to report honestly such occurrences. It is not for this court to re-weigh the substantial evidence (detailed above) which supports the MTA's determination. Rather, the correctness of that determination is properly a subject of the collectively bargained grievance and arbitration process, a process which was abandoned by Rowe's Union.

The same result obtains as to Rowe's retaliation claims. To establish a prima facie case of retaliation, Rowe must marshal evidence to show that (1) she engaged in protected activity; (2) the MTA took adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 271 (4th Cir. 2001); *Fox v. Gen. Motors Corp.,* 247 F.3d 169, 176 (4th Cir.2001).

█ It must be recalled that the first date on which Rowe could plausibly contend she "engaged in protected activity" is November 10, 1999, when, giving her the benefit of considerable doubt, one might regard her insistence that she not be required to accept a light duty assignment as having constituted a demand to stay home from work in reliance on the ADA, or as a demand to stay home from work (as other *unidentified* males or whites were permitted to do) in reliance on Title VII. Thus, to establish a prima facie case of retaliation, Rowe must show that the MTA's decision (i.e., Deaver's decision) to terminate her employment is causally related to her protests of November 10 and 11, 1999.

Of course, close temporal proximity might support a showing of causation, *see Rhoads v. Fed. Dep. Ins. Corp.,* 257 F.3d 373, 393 (4th Cir.2001), but that rule does not appear to help Rowe here. In any event, however, it simply strains all logic to conclude that Deaver's decision on February 22, 2000, to issue the disciplinary charge, giving notice of his intention to seek Rowe's termination, was casually related to Rowe's protestations about having to accept a light duty assignment in November of the preceding year. Indeed, although Rowe disputes the precise verbal exchange between herself and Deaver, the record shows that Deaver actually continued his investigation about a week after Rowe returned to work *to perform a light duty assignment as to which she expressed no objection.* Consequently, I conclude

that Rowe has not established a prima facie case of retaliation.

 In any event, however, as discussed above, Rowe has not generated a genuine dispute of fact as to the bona fides of the non-retaliatory reason for the MTA's termination of her employment. Rowe simply ascribes a discriminatory or retaliatory motive to what is on the face of the matter a rational assessment of her lack of credibility. The MTA acted on the basis of objective facts, including the laws of physics. Moreover, the MTA was entitled to make its decision to credit the attestation of its employee of 25 years, Sullivan, who says the mobility van did not come to an abrupt stop, and to reject the contrary assertion of a co-employee, one who had vowed, according to a high level manager, to intentionally injure herself if she were required to accept a light duty assignment before she thought she was ready to do so. In short, a genuine dispute of fact as to pretext has not remotely been shown on this record.

## IV.

As with her disparate treatment and retaliation claims, Rowe's harassment claims under Title VII and the ADA do not survive summary judgment. To avoid summary judgment on her hostile environment employment discrimination claims, Rowe is required to project evidence sufficient to permit a reasonable juror to find the following elements: "that the offending conduct (1) was unwelcome, (2) was based on [a prohibited factor], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir.2003)(en banc).

 It must be recalled that between her return to the workplace to perform her light duty assignment on November 10, 1999, and her receipt of the notice of proposed termination on February 22, 2000, Rowe was present in the workplace for a total of about six or seven days at most (two days in November 1999, and four to five days in February 2000) for no more than four hours on each day. I do not understand Rowe to contend that she was harassed during her brief period of light duty in February 2000. On this record, therefore, Rowe's hostile work environment claim rests wholly on the activities of November 10, 11, and 15, 1999. (Rowe never made it to work on November 16, 1999). Thus, her claims reduce to refusals to give her a larger chair, intimidating stares and such. There is no evidence that race or gender played any role whatsoever in these acts or omissions by MTA, in any event. As a matter of law, therefore, Rowe's hostile work environment claims fail on elements (2) and (3) and defendants are entitled to judgment as a matter of law.

## V.

 Finally, Rowe asserts a claim under the ADA for failure to provide a reasonable accommodation. The Fourth Circuit has explained that

> In a failure to accommodate case, a plaintiff establishes a prima facie case by showing "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations."

*Rhoads*, 257 F.3d at 387, n. 11 (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999)).

In her opposition to the motion for summary judgment and at the hearing on the

motion, Rowe identified the following acts and omissions as denials of reasonable accommodation under the ADA: (1) requiring her to take a light duty assignment before she was ready to do so; (2) requiring her to sit on a chair that was too small and uncomfortable for her while she performed the light duty assignment; and, (3) when she boarded the mobility van operated by Sullivan on November 16, 1999, to be transported to the Bush Street facility to perform her light duty assignment, Sullivan failed to buckle her into her seat, thereby contributing to her additional injuries attendant to her fall from the seat when Sullivan allegedly came to an abrupt stop at the Wilkins Avenue intersection.

I reject these contentions. Assuming that Rowe was disabled within the meaning of the ADA during the period November 10 through 16, 1999, none of these alleged acts and omissions by the MTA rose to the level of an ADA violation. The fact that on November 9, 1999, Dr. Shepard released Rowe for light duty fatally undermines Rowe's contention that the MTA's enrollment of her in the light duty program violated her rights under the ADA. Understandably, Rowe was greatly annoyed that Dr. Shepard acted without first consulting her. The fact is that, even after she complained to her own treating physician (on November 11, 1999), prompting him to withdraw the certification for light duty until November 30, 1999, he nevertheless "re-released" her upon receiving a call from Seiling, who called to inquire about the inconsistent directions he was providing to the MTA. Rowe's inability to persuade her own physician that the incessant pain she claimed to experience required that she stay at home cannot support a claim for denial of reasonable accommodation.

Second, as a matter of law under the circumstances shown on this record, Rowe's reliance on MTA's alleged denial of a *larger chair* does not support a claim for denial of a reasonable accommodation. Rowe has produced neither photographic nor dimensional evidence of the actual chair, and she has not produced evidence from Dr. Shepard that she required any particular seating arrangement. Indeed, the evidence in the record shows that after Rowe's sutures were removed, she was to wear a shoulder sling solely to avoid "inadvertent recurrent trauma."

Finally, Rowe's contention that Sullivan's failure to buckle her into the mobility van is especially disingenuous. Rowe did not ask that he do so; thus, she did not engage in the "interactive process" "which the ADA not only contemplates but unambiguously mandates." *Peeples v. Coastal Office Products, Inc.*, 203 F.Supp.2d 432, 462 n. 19 (D.Md.2002), *aff'd,* 64 Fed.Appx. 860, 2003 WL 21019353 (4th Cir. May 7, 2003). Thus, even assuming that duties arguably owed to Rowe in her status as a *passenger* of the MTA may be imported into her employment relationship with the MTA, Sullivan's failure to ask if Rowe wanted to be buckled in (she does not even attest that she would have accepted such an offer) does not provide a basis for a denial of reasonable accommodation claim.

### VI.

Rowe conceded at the motion hearing that all of her redundant claims, i.e., the Rehabilitation Act claim, and the claims under sections 1981, 1983, 1985, and 1986, rise or fall with her claims under Title VII and the ADA. Accordingly, the above analysis disposes of all of Rowe's claims.

### VII.

For the reasons set forth, judgment shall be entered in favor of all defendants against plaintiff. An order follows.